**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF IOWA**

In the Matter of:

**Steven L. Morrell**,                                            Case No. **10-05431-lmj7**

        Debtor

**Earlham Savings Bank**,                                  Adv. Pro. No. **11-30032-lmj**

        Plaintiff                                              [UNPUBLISHED]

v.

**Steven L. Morrell**,

        Defendant

**MEMORANDUM OF DECISION**
**(date entered on docket: March 28, 2014)**

Plaintiff Earlham Savings Bank ("Bank") filed a complaint to determine dischargeability of debt pursuant to paragraphs (2) and (6) of 11 U.S.C. section 523(a) and to object to discharge pursuant to paragraphs (2), (3), (4) and (5) of 11 U.S.C. section 727(a) in the Chapter 7 case filed by Debtor Steven L. Morrell ("Debtor"). The Bank filed a motion for summary judgment on all but the section 523(a)(2) count. The Bank prevailed only as to liability under the section 523(a)(6) count. When the parties were unable to reach an agreement regarding the amount of damages related to that count, the Bank requested an initial trial limited to that issue in case the result disposed of a need to proceed to trial on the other counts. Having reviewed the record, including the transcript of the January 31, 2013 trial on damages, the exhibits, and the post-trial written arguments of counsel, the Court enters its decision concluding that the Bank is entitled to an $18,600.00 judgment pursuant to section 523(a)(6).

The Court has jurisdiction of this matter pursuant to 28 U.S.C. section 1334 and the standing order of reference entered by the United States District Court for the Southern District of Iowa.  This is a core matter under 28 U.S.C. section 157(b)(2)(I).

BACKGROUND

Debtor owned and operated a geothermal business for approximately twenty-five years.  From December 2000 through August 2011, the business went by the name of Morrell Company, L.C. ("Morrell Company").  Over time the Bank made a number of loans to Morrell Company that were secured by blanket liens in all of the business property.  Debtor signed the promissory notes in his capacity as manager/member and executed unlimited personal guarantees for each of the loans.

In 2008 Morrell Company fell upon hard times, and Debtor considered shutting down the business.  Shortly thereafter the relationship between the Bank and Debtor soured.  On August 26, 2009 the Bank filed a petition for replevin in the Iowa District Court in and for Dallas County against Morrell Company and Debtor.  The Bank sought to recover the following items:

| Item / Group | Item Name | Model |
| --- | --- | --- |
| A | 2007 Dodge | Durango |
| B | 2005 International and Versa-Drill | Truck and V-100NG |
| D / 1 | 2007 Ford and 2007 DR Drill | XL 650 and 155 Drill Rig |
| F / 1 | 2005 Ford | F550 |
| G / 1 | 2000 Ford | F750 |
| H / 1 | 2001 Ford | F450 |
| I | 2003 Dodge | Dakota |
| J / 1 | 1994 Ford | F450 XL/XLT |
| K | 1992 Chevrolet | Astro |
| L / 2 | 2005 SMP and Line Tamer | Trailer and Line Tamer |
| M / 2 | 2002 John Deere | 270 Skid Steer |
| N / 2 | Grout Pump | Unknown |

Despite the pending replevin action and without consulting the Bank, Debtor removed various parts from the Group 1 Items (the Ford vehicles) and sold them for use as scrap metal between late 2009 and early 2010.  According to Debtor's testimony, he sold a hydraulic derrick that had been attached to Item G for around $2,500.00, parts from Item J for around $2,000.00, beds from Items F, G, H, and J for around $3,000.00, and stems from Item D for between $150.00 and $200.00.  He did not turn over any of the $7,650.00 to $7,700.00 sale proceeds to the Bank.

Despite the pending replevin action and without consulting the Bank, Debtor sold the Group 2 Items in early 2010.  Debtor testified that he sold Item L for around $1,400.00 (as scrap iron weight), Item M to his cousin for $8,000.00 (after rejecting an offer of $5,000.00 from another individual), and Item N to someone in Nebraska for around $1,500.00.  Debtor did not turn over any of the $10,900.00 sale proceeds to the Bank.

By contrast, when Debtor received an offer from an individual to purchase all the Group 1 Items for $150,000.00 in January 2010, he presented the offer to the Bank. The Bank questioned the current value of the Ford vehicles given the original purchase price of at least one of them.  The Bank decided against inspecting its collateral because the vehicles were at various locations throughout the Midwest.  Accordingly, the Bank rejected the proposal.  Debtor also sought permission from the Bank to sell Item B, the 2005 International and Versa Drill, in April 2010 for $195,000.00.  The Bank agreed to that sale.  Debtor turned over all the sale proceeds to the Bank.

On June 11, 2010 the Bank filed a motion for summary judgment in the replevin action.  Morrell Company and Debtor filed a resistance.  On July 20, 2010 the state

court conducted a hearing on the matter and then entered a minute order granting partial summary judgment and directing the Bank's attorney to prepare the formal order. On September 14, 2010 the court entered an order granting the Bank a monetary judgment of $29,950.00 for the Group 2 Items (that no longer were believed to be in the possession of Morrell Company and Debtor) and entitling the Bank to immediate possession of the Group 1 Items and Items A, I, and K (that were believed to be in the possession of Morrell Company and Debtor). On the same date, the court issued a writ of replevin for the latter items—with the exception of the drill rig portion of Item D. (In the order, the court had concluded that the Bank was entitled to immediate possession of the drill rig or a monetary judgment for it. That is, the court found that the value of the drill rig had not been established as a matter of law and reserved that issue for trial.)

Information on the state court's docket sheet reveals that the Bank filed a motion to amend the September 14, 2010 order on September 23, 2010 and the court entered an amended order and issued an amended writ of replevin on October 11, 2010. This Court has been unable to locate any of those documents in the record before it. However, the affidavit of Dallas County Sheriff Deputy Shelley Reese ("Deputy Reese"), that was attached as Exhibit A to the Bank's Response to Debtor's Objection to the Bank's Motion for Summary Judgment (Docket Number 41), provides some information about what occurred. That is, the Bank asked Deputy Reese to return the original writ of replevin because of a typographical error in one of the vehicle identification numbers. The amended writ of replevin did correct the number for Item G, the 2000 Ford F750, but also added the drill rig and the Group 2 Items to the list. The addition of the drill rig may be related to Deputy Reese locating all of Item D (along with Item F, the 2005 Ford

F550) at a repair shop in Ankeny, Iowa. It is not clear why the Group 2 Items were added to the list.

Another anomaly is that Item K, the 1992 Chevrolet Astro, appeared on both writs of replevin, but the Bank's Vice President testified that the Bank recovered that collateral in July of 2010 when it obtained the deed to the business real estate as a result of the foreclosure action it had commenced on August 26, 2009 in the same state court. The vehicle was at the site. It was in wrecked condition. Instead of selling the collateral, the Bank allowed the individual hired to clean the premises to haul it away.

On October 18, 2010 Deputy Reese served the amended writ of replevin on Debtor at an address in Van Meter, Iowa. In a subsequent phone conversation, Deputy Reese understood Debtor to say he had sold the items on the amended writ of replevin and the items were not located in Dallas County, Iowa. On November 2, 2010 the Bank filed an application in the replevin action requesting the state court to order Morrell Company and Debtor to appear and to show cause why they should not be held in contempt.

On November 7, 2010 Debtor commenced this Chapter 7 case. On Schedule F (Creditors Holding Unsecured Nonpriority Claims), Debtor listed the Bank as a creditor with an unliquidated and disputed claim of $1,000,000.00, described as "guranty [sic] of Morrell Company debt." (Docket No. 11 at 19.) On Schedule D (Creditors Holding Secured Claims), Debtor listed the Bank as a creditor with a mortgage claim of $66,000.00 against real property in Waukee, Iowa. On Schedule C (Property Claimed As Exempt), Debtor identified the property as his homestead.[1]

---

[1] On December 20, 2010 this Court granted the Bank relief from the automatic stay to proceed with the foreclosure action it had commenced against Debtor's homestead in October 2010.

Debtor testified that he returned Items A and I (the Dodge vehicles) and the Group 1 Items before he filed his petition for relief with this Court as part of some agreement with the Bank. However, Deputy Reese reported taking possession of Item F, the 2005 Ford F550, on November 19, 2010 and taking possession of Items A and I and all but Item H, the 2001 Ford F450, of the Group 1 Items on December 8, 2010. (Deputy Reese made no mention of taking possession of Item H.)[2] Information on the state court's docket sheet reveals that the Bank filed a release-satisfaction and a dismissal of the replevin action with prejudice on December 21, 2010. This Court has been unable to locate those documents in the record before it.

With respect to the February 2011 liquidation of Items A and I and the Group 1 Items, the Bank placed a picture-advertisement of all the items in a local newspaper in Dallas County, Iowa and in Madison County, Iowa. The Bank instructed interested buyers to submit sealed bids. There would be no opportunity for further bidding. Between fifteen to twenty bidders participated in the sale, and the Bank sold each item to the highest bidder. As a result, the Bank realized just under $16,000.00 for Item A, $3,000.00 for Item I, and a total of $45,000.00 for the Group 1 Items.

APPLICABLE LAW

11 U.S.C. section 523(a)(6) provides in relevant part: "(a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt—(6) for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). The plaintiff has the burden of proving all the elements of the section by a preponderance of the evidence. See Grogan v. Garner,

---

[2] Deputy Reese did not violate the automatic stay. The replevin items were not assets of the bankruptcy estate, and the state court indicated in its September 14, 2010 order that Morrell Company and Debtor were jointly and severally liable. (This Court assumes that did not change in the October 11, 2010 order.)

498 U.S. 279, 291 (1991).  To meet this burden, the plaintiff must prove three elements. First, the plaintiff must prove that the debtor's actions were willful.  Second, the plaintiff must prove that the debtor's actions were malicious.  See Sells v. Porter (In re Porter), 539 F.3d 889, 893 (8th Cir. 2008) ("Willful and malicious are two distinct requirements . . . ."). Third, the plaintiff must prove the amount of the debt that should be declared nondischargeable due to the debtor's willful and malicious actions.  See Bank of Iberia v. Jeffries, (In re Jeffries), 378 B.R. 248, 256 (Bankr. W.D. Mo. 2007) ("[T]he debt may be declared nondischargeable only to the extent of the damage caused by Debtor's willful and malicious conduct.").

The Supreme Court has concluded that section 523(a)(6) sounds in intentional tort.  See Kawaauhau v. Geiger, 523 U.S. 57, 61 (1998).  Conduct that justifies excepting debts from discharge under section 523(a)(6) is the same conduct that gives rise to liability for state law intentional torts.  See Hamilton v. Hamilton (In re Hamilton), 390 B.R. 618, 631 (Bankr. E.D. Ark. 2008), *aff'd*, 400 B.R. 696 (E.D. Ark.), *aff'd*, 358 Fed. App'x 762 (8th Cir. 2009).  State law intentional tort cases involving parallel situations can assist in the determination of the appropriate measure of damages and provide guidance on calculating damages.  See, e.g., id.; Bank of Iberia v. Jeffries, (In re Jeffries), 378 B.R. 248 (Bankr. W.D. Mo. 2007).

The promissory notes and security agreements indicate that they are governed by Iowa law.  In Iowa, damages must be proven by a preponderance of the evidence. Iowa R. App. P. 6.904(3)(f).  Damages calculations involve a determination of the allowance of damages followed by a determination of the measure of damages.  Tom Riley & Peter C. Riley, Iowa Practice: Civil Litigation Handbook 194 (2012).

DISCUSSION

This Court disposed of the first and second elements of 11 U.S.C. section 523(a)(6) in the Bank's favor at the conclusion of the September 7, 2012 hearing on the Bank's motion for summary judgment. The amount of the debt that should be declared nondischargeable due to Debtor's willful and malicious actions remains in issue.

<u>Group 1 Items – No Damages Based on Diminishment of Value</u>

The Bank contends that Debtor's willful and malicious stripping of the Group 1 Items resulted in a market value decrease of at least $105,000.00 based on the difference between the $150,000.00 purchase offer in January 2010 and the $45,000.00 realized from the sealed bid auction in February 2011. Debtor argues that the Bank's manner of disposing of the Group 1 Items diminished the value of that collateral. Specifically, Debtor questions why the Bank did not approach him to see if he could follow-up on the earlier $150,000.00 offer. Debtor questions why the Bank instead pursued a commercially unreasonable sealed bid auction. Debtor questions why the Bank limited advertising of the auction to two counties in Iowa when it could have advertised at least Item D, the 2007 Ford and 2007 DR Drill, in a national driller's magazine—as the Debtor had done to obtain the $195,000.00 offer for Item B, the 2005 International and Versa-Drill.

Both parties rely on the measure of damages rule articulated in <u>Bank of Iberia v. Jeffries (In re Jeffries)</u>, 378 B.R. 248 (Bankr. W.D. Mo. 2007). In that case, the debtor removed various parts from a truck, resulting in the diminishment of the truck's value. <u>Id.</u> at 251-52. The bankruptcy court concluded that "[t]he general rule for measuring damage to personal property by others is the difference between the fair market value

immediately before and immediately after the event causing the damage." Id. at 256-57. In other words, the general rule applies in situations where an injury to property results in a diminishment of its value.

Though Debtor's stripping parts off the Group 1 Items may have impacted the value of the items, the measure of damages related to those actions is better addressed under a conversion analysis. That is, the Court finds Debtor's concerns about the Bank's method of liquidating the items to be legitimate. Based on the record, the Court cannot conclude that the $45,000.00 sale price was attributable to Debtor's willful and malicious actions. Rather, the Court finds it was due to the manner in which the Bank chose to dispose of the items.

### Group 1 Items – Damages Based on Conversion

The Supreme Court of Iowa has defined conversion as " 'the wrongful control or dominion over another's property contrary to that person's possessory right to the property.' " Lewis v. Jaeger, 818 N.W.2d 165, 188 (Iowa 2012) (quoting Condon Auto Sales & Serv., Inc. v. Crick, 604 N.W.2d 587, 593 (Iowa 1999)). The measure of damages rule for conversion in Iowa is that the injured party is entitled to "the fair and reasonable market value of the property at the time of the taking." Murray v. Conrad, 346 N.W.2d 814, 821 (Iowa 1984). In Gateway Sav. Bank v. Ricci (In re Ricci), No. 01-20129, 2003 WL 25932297 (Bankr. S.D. Iowa Aug. 27, 2003), the debtor sold the bank's collateral without its permission and failed to turn over any of the proceeds. In awarding the bank damages under 11 U.S.C. section 523(a)(6), United States Bankruptcy Judge Russell J. Hill utilized the Iowa measure of damages rule for conversion.

The Bank contends that Debtor's willful and malicious stripping of the Group 1 Items and his retention of the $7,650.00 to $7,700.00 sale proceeds was a personal gain for him—at the Bank's expense. Debtor argues that he stripped and sold parts of the Group 1 Items in the ordinary course of business to obtain operating capital for payroll, fuel, tools and similar expenses.

The record contains no evidence corroborating Debtor's testimony about the purpose of the stripping or the use of the proceeds. The time line indicates Debtor's actions occurred after the Bank commenced the replevin action. The $7,650.00 to $7,700.00 in sale proceeds that Debtor realized is the best indication of the market value of the property at the time of the taking. The Court finds $7,700.00 to be the amount of debt that should be declared nondischargeable due to Debtor's willful and malicious actions with respect to the Group 1 Items.

Group 2 Items – Damages Based on Conversion

Preliminarily the Court observes that often the determination of damages is based on the amount awarded in a state court judgment. See, e.g., Siemer v. Nangle (In re Nangle), 274 F.3d 481, 485 (8th Cir. 2001) (holding debt from state court judgment and contempt order nondischargeable); Fischer v. Scarborough (In re Scarborough), 171 F.3d 638, 645 (8th Cir. 1999) (holding debt from state court judgment nondischargeable), cert. denied, 528 U.S. 931 (1999). The Bank does not suggest that this Court should adopt the $29,950.00 judgment the state court awarded for the Group 2 Items. Presumably that is because of the status of the state court docket.

Similar to its argument for damages based on the conversion of the Group 1 Items, the Bank contends that Debtor's willful and malicious selling of the Group 2 Items and his retention of the $10,900.00 sale proceeds was a personal gain for him—at the Bank's expense.  Debtor argues that he also sold the Group 2 items in the ordinary course of business to obtain operating capital for payroll, fuel, tools and similar expenses.

Again the record contains no evidence corroborating Debtor's testimony about the purpose of the selling or the use of the proceeds.  Again, the time line indicates Debtor's actions occurred after the Bank commenced the replevin action.  The $10,900.00 in sale proceeds that Debtor realized is the best indication of the market value of the property at the time of the taking.  The Court finds $10.900.00 to be the amount of debt that should be declared nondischargeable due to Debtor's willful and malicious actions with respect to the Group 2 Items.

<u>Remaining Personal Property – No Damages</u>

The Bank contends that Debtor's willful and malicious scrapping, selling or transferring of two geo-loop machines, shop tools, shop equipment and office equipment (collectively purchased for $46,431.00) in particular and of all remaining business personal property in general was a personal gain for him—at the Bank's expense.  The Bank acknowledges that the fair market value at the time of Debtor's actions is unknown but, noting Debtor attested to the total book value of the Morrell Company assets being $1,200,000.00 on July 21, 2009, alleges it was undoubtedly and substantially harmed by Debtor's actions even if the fair market value of the property was only half that amount.  Debtor argues the Bank's request for damages related to

Case 11-30032-lmj    Doc 73    Filed 03/28/14    Entered 03/28/14 16:46:58    Desc Main
                    Document      Page 12 of 13
12

this catch-all category of collateral suffers from, among other issues, a need for speculation on the part of this Court.

In Iowa, a court must have " 'proof of a reasonable basis from which the amount [of damages] can be inferred or approximated.' " Pavone v. Kirke, 801 N.W.2d 477, 495 (Iowa 2011) (quoting Olson v. Nieman's, Ltd., 579 N.W.2d 299, 309 (Iowa 1998)); see also Hawkeye Motors, Inc. v. McDowell, 541 N.W.2d 914, 917-18 (Iowa Ct. App. 1995) (indicating that damages determinations in a bench trial ordinarily lie with the court's discretion, but noting that proof of a reasonable basis for damages is still required). Moreover, "some speculation on the amount of damages sustained is acceptable; however, *overly speculative damages cannot be recovered*." Pavone, 801 N.W.2d at 495 (emphasis added).

With respect to this amorphous category of collateral, the Court finds the Bank's factual record lacking and its legal argument strained. It is not clear what items should be included in the group. It is not clear how and when Debtor disposed of the items. With the exception of the Debtor testifying that maybe he received $50.00 for four computers, it is not clear what Debtor gained at the Bank's expense. Hence, any attempt to arrive at an amount of damages would require speculation beyond the permissible limit.

Lastly, with respect to the $7,700.00 damages amount for the Group 1 Items and the $10,900.00 damages amount for the Group 2 Items, the rate of interest allowed from the date of conversion is the legal rate rather than the contract rate. F.S. Credit Corp v. Shear Elevator, Inc., 377 N.W.2d 227, 235 (Iowa 1985). Given the record only indicates the underlying conversions took place between late 2009 and early 2010, the

Court deems March 28, 2010 to be an applicable date for the purpose of calculating interest for all items in both groups.

## CONCLUSION

WHEREFORE, for the reasons set forth in this Memorandum of Decision, the Court finds that the Bank has sustained its burden of proving by a preponderance of the evidence that $18,600.00 of the debt in issue is nondischargeable pursuant to section 523(a)(6).

A separate Order and Judgment shall be entered accordingly.

/s/ Lee M. Jackwig
Lee M. Jackwig
U.S. Bankruptcy Judge

Parties receiving this Order from the Clerk of Court:
Electronic Filers in this Adversary Proceeding